UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| MILORAD RAICEVIC | § | |
| | § | |
| Plaintiff | § | CIVIL ACTION NO.: 3:15-cv-327 |
| | § | |
| *Versus* | § | |
| | § | |
| WOOD GROUP PSN, INC., ET AL. | § | **TRIAL BY JURY DEMANDED** |
| | § | |
| Defendants | § | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' JOINT SUPPLEMENTAL POST-TRIAL BRIEF REGARDING BORROWED EMPLOYEE ISSUES**

Respectfully submitted,

MORROW & SHEPPARD LLP

*/s/ John D. Sheppard*
 John D. Sheppard (attorney-in-charge)
 State Bar No.  24051331
 Fed Bar No. 635193
 jsheppard@morrowsheppard.com
 Nicholas A. Morrow
 State Bar No.  24051088
 Fed Bar No. 611443
 nmorrow@morrowsheppard.com
3701 Kirby Dr, Ste 1000
Houston, TX  77098
Telephone: (713) 489-1206
Facsimile: (713) 893-8370

***Attorneys for Plaintiff***

i

## <u>CERTIFICATE OF SERVICE</u>

I certify that on February 9, 2018 a true and correct copy of this document was served on all counsel of record registered with the Court's ECF filing system.

*/s/ John D. Sheppard*
John D. Sheppard

# TABLE OF CONTENTS

Table of Contents................................................................................................iii

Table of Authorities ............................................................................................ v

I.      Nature and State of Proceeding .............................................................. 1

II.     Issues to Be Ruled Upon – Defendants Improperly Seek to Disregard the Jury Findings; This Court Should Not Do So, and Should Deny Borrowed Servant Status ..... 1

III.    Defendants Have Omitted Critical Standards – This Court Cannot Substitute Its Judgment for the Jury's, and Must Draw All Inferences in Favor of Plaintiff .................. 2

IV.     Courts Give Effect to Jury's Findings on Borrowed Servant .................................. 4

V.      The Fifth Circuit has Held it is Reversible Error to Usurp Factual Issues from the Jury When Determining Borrowed Servant Status ............................................. 5

VI.     The Jury's Factual Findings on Borrowed Servant Guide the Analysis ................. 6

VII.    It Was Defendants' Burden to Prove Borrowed Servant to the Jury, Which They Failed to Do ................................................................................................. 6

VIII.   The Jury Was Entitled to Disregard Defendants' Witnesses and Borrowed Servant Story Entirely ................................................................................................. 9

IX.     Saying Things are so Does Not Make Them So ..................................................... 16

X.      *Ruiz* Factor 1:  Control – Answered in Plaintiff's Favor (Current Tally: 1-0) ....... 17

XI.     *Ruiz* Factor 2:  Answered in Defendants' Favor (Current Tally:  1-1) .................. 23

XII.    *Ruiz* Factor 3:  Answered in Plaintiff's Favor (Current Tally:  2-1) ..................... 24

XIII.   *Ruiz* Factor 4:  Answered in Plaintiff's Favor (Current Tally:  3-1) ..................... 26

XIV.    *Ruiz* Factor 5:  Answered in Plaintiff's Favor (Current Tally:  4-1) ..................... 26

XV.     *Ruiz* Factor 6:  Answered in Defendants' Favor (Current Tally:  4-2) ................. 27

XVI.    *Ruiz* Factor 7:  Answered in Plaintiff's Favor (Current Tally:  5-2) ..................... 28

XVII.   *Ruiz* Factor 8:  Answered in Plaintiff's Favor (Current Tally:  6-2) .................... 28

XVIII. *Ruiz* Factor 9:  Answered in Plaintiff's Favor (Final Tally:  7-2—and Heavily Weighted in Plaintiff's Favor Considering the Control Finding)..................................... 30

XIX.    None of Defendants' Cases are Helpful to Their Position, Which They had the Burden to Prove ............................................................................................. 32

XX.     Defendants Have Not Even Met the Conditions Precedent to a Borrowed Servant Defense, Namely, That Plaintiff was Covered and Paid LHWCA Benefits ..................... 35

XXI.    Defendants' Request for a Borrowed-Servant Finding Between (a) Fieldwood (b) Wood Group and (c) Island Must be Denied as The Jury Did Not Reach the Issue ......... 37

XXII.  Conclusion and Prayer..........................................................................................38

# TABLE OF AUTHORITIES

## Cases

*Benoit v. Transco Exploration Co.*, 577 F. Supp. 304 (W.D. La. 1983) ............................ 4

*Bourgeois v. W & T Offshore Inc.*, 2013 WL 4501326 (E.D. La. 2013) .......................... 34

*Brown v. Union Oil Co.*, 984 F.2d 674 (5th Cir. 1993) ............................................... passim

*Capps v. N.L. Baroid-NL Industries Inc.*, 784 F.2d 615 (5th Cir. 1986) .......................... 17

*Castille v. Apache Deep Water LLC et al.*, 2017 WL 2814068 (W.D. La. 2017).. 5, 21, 32, 33

*Cormier v. Gulf Oil Corp.*, 665 F. Supp. 1226 (E.D. La. 1987) ....................................... 22

*Gonzalez v. Missouri Pac. R. Co.*, 511 F.2d 629 (5th Cir. 1975) .................................... 37

*Green v. Milbar Hydro-test, Inc.*, 210 F.3d 369, *1 (5th Cir. 2000) ........................... 6, 37

*MacArthur v. University of Texas Health Center at Tyler*, 45 F.3d 890 (5th Cir. 1995) ..... 7

*Melancon v. Amoco Prod. Co.*, the case on which Defendants principally rely.  834 F.2d 1238 (1988) ......................................................................................................... 5

*Melancon v. Amoco Production Co.*, 834 F.2d 1238 (5th Cir. 1988) ............................... 34

*Mosley v. Wood Group PSN Inc.*, 2017 WL 440792 (E.D. La. 2017) ............................. 34

*Picquet v. M.I. Drilling Fluids LLC*, 1998 WL 398046 (E.D. La. 1998) .......................... 9

*Reeves v. Sanderson Plumbing Products Inc.*, 530 U.S. 133 (2000) ........................... 2, 23

*Robinson v. Apache Corp.*, 2006 WL 622917 (E.D. La. 2006) ....................................... 22

*Ruiz v. Shell Oil Co.*, 413 F.2d 310 (5th Cir. 1969) ........................................ 9, 17, 18, 30

*Russell v. McKinney Hosp. Venture*, 235 F.3d 219 (5th Cir. 2000) ............................... 3, 4

*Special Promotions Inc. v. Southwest Photos Ltd.*, 559 F.2d 430 (5th Cir. 1977) ........... 37

*U.S. v. Molina-Iguado*, 894 F.2d 1452 (5th Cir. 1990) ................................................ 6

*U.S. v. Zuniga*, 18 F.3d 1254 (5th Cir. 1994) ............................................................. 3

*Washington v. Fieldwood Energy LLC*, 2018 WL 263230 (Jan. 2, 2018) (E.D. La. 2018) 4

*West v. Kerr-McGee Corp*, 765 F.2d 526, 531 (5th Cir. 1985) ....................................... 32

## Statutes

30 CFR 250.1931(c) ..................................................................................................... 8

33 U.S.C. 905(a) ......................................................................................................... 36

U.S. CONST. amend. VII .............................................................................................. 34

Fed. R. Civ. P. 50(a) ................................................................................................. 1, 2

## I.    NATURE AND STATE OF PROCEEDING

A jury trial in this case was held, and was concluded on January 26, 2017.  The Court has requested additional briefing on borrowed servant issues.  If the Court rules that Plaintiff was the borrowed servant of Defendant Fieldwood, Defendants will argue he recovers nothing.

## II.   ISSUES TO BE RULED UPON – DEFENDANTS IMPROPERLY SEEK TO DISREGARD THE JURY FINDINGS; THIS COURT SHOULD NOT DO SO, AND SHOULD DENY BORROWED SERVANT STATUS

The Defendants seek judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a).  *See* Dkt. 297 (the "Brief").  Defendants ask this Court to "disregard the jury's findings" as to borrowed servant.  Brief n.1.

The Court will recall that the jury carefully deliberated for many hours, over the course of two days, following a trial that spanned three weeks and which involved approximately 17 witnesses and hundreds of exhibits.  The jury assigned 50 percent blame to the Plaintiff, thereby cutting his damages in half.  The jury's answers to the Court's verdict form reflect that they gave this case careful consideration.  This was not a rush to judgment, or a decision skewed unfairly toward the Plaintiff.  The Founding Founders fought for the Seventh Amendment right to civil jury trials precisely so that the Mickey Raicevics of the world could have their cases decided by a jury of their peers.  *See* U.S. CONST. amend. VII.

Defendants' Rule 50(a) motion must be denied.  For the following reasons, this Court should rule (a) that Plaintiff was not Fieldwood's borrowed servant, and (b) should

1

not reach the separate issue of whether Defendants Wood Group and Island Operating were the borrowed servants of Defendant Fieldwood.[1]

### III.   DEFENDANTS HAVE OMITTED CRITICAL STANDARDS – THIS COURT CANNOT SUBSTITUTE ITS JUDGMENT FOR THE JURY'S, AND MUST DRAW ALL INFERENCES IN FAVOR OF PLAINTIFF

Defendants' Brief omits critical standards of review.  The U.S. Supreme Court has held this Court cannot second-guess the jury's findings as to the weight of evidence or the credibility of witnesses when determining a Rule 50 motion.  As will be discussed herein, that is precisely what the Defendants necessarily request.

In *Reeves v. Sanderson Plumbing Products Inc.*, the Supreme Court reversed the lower court's judgment of law under Rule 50 due to insufficient evidence to support the jury's age discrimination verdict.  530 U.S. 133 (2000).  At trial, the defendants asserted Rule 50 motions, which were denied.  *Id.* at 138.  The jury found in favor of the plaintiff, and the trial court entered judgment.  *Id.*  The Fifth Circuit reversed and granted the Rule 50 motions.  *Id.*

The Supreme Court reversed and reinstated the verdict.  *See generally Reeves v. Sanderson Plumbing Products Inc.*, 530 U.S. 133 (2000).  The Supreme Court held that in deciding a Rule 50 motion, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Products Inc.*, 530 U.S. 133, 150 (2000).  The Court held,

---

[1] Plaintiff incorporates his Response to the Defendant's Pre-Verdict Motion for Judgment, which Plaintiff filed on January 26, 2018.

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves*, 530 U.S. at 150. The Supreme Court continued, "Thus, although the court should review the record as a whole, ***it must disregard all evidence favorable to the moving party that the jury is not required to believe***."[2] *Id.* at 151 (emphasis added). The Supreme Court then pointed to selective evidence that supported the jury's findings, held that that the lower court had "disregarded critical evidence favorable" to plaintiff, had "failed to draw all reasonable inferences in favor of" plaintiff, and had "impermissibly substituted its judgment concerning the weight of the evidence for the jury's." *Id.* at 152-153.

The Fifth Circuit has likewise held it is the "sole province of the jury as the fact finder to decide the credibility of the witnesses and to choose among reasonable constructions of evidence." *U.S. v. Zuniga*, 18 F.3d 1254, 1260 (5th Cir. 1994). It is not the role of the court to "second guess the jury in its choice" of what to believe. *Zuniga*, 18 F.3d at 1260. In *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 225 (5th Cir. 2000), the Fifth Circuit cited several cases, summarized holdings, and discussed how a jury's factual determinations as to conflicting evidence are to be respected, including but not limited stating the following:

> "The jury had both conflicting versions before it and apparently did not find credible defendants' explanation…"
>
> "…the court would not second guess the jury in its choice…"
>
> "…it was a serious mistake to second-guess judgments that were made firsthand…"

---

[2] Obviously, the jury is not required to believe testimony of witnesses that is not credible.

"…we will not second guess [the jury's] rejection of defendants' proffered justification…"

"…the court may not make credibility determinations or weigh the evidence…"

*Russell*, 235 F.3d at 225.

Here, the evidence in support of the jury's findings is significant. In fact, it is overwhelming if—as is required—all reasonable inferences are given to Plaintiff, and if evidence favorable to Defendants that need not be believed is disregarded. When this Court follows these standards, as it must, Defendants' Rule 50 motion must be denied.[3]

## IV.   COURTS GIVE EFFECT TO JURY'S FINDINGS ON BORROWED SERVANT

Plaintiff is not aware of a single case overturning or disregarding a jury's verdict regarding borrowed servant status; the Defendants certainly have not cited any. There are, however, cases giving effect to the jury's borrowed servant findings. *See Benoit v. Transco Exploration Co.*, 577 F. Supp. 304, 309 (W.D. La. 1983). Courts have also recently held that Fieldwood failed to prove borrowed servant status. *See Washington v. Fieldwood Energy LLC*, 2018 WL 263230, *3 (Jan. 2, 2018) (E.D. La. 2018) (holding Fieldwood had not proven borrowed servant as a matter of law at the summary judgment stage).

Finally, as discussed next, there is at least one Fifth Circuit case reversing a trial court for usurping the jury's role in determining borrowed servant issues.

---

[3] Even if these standards were not followed, the jury's findings on borrowed servant should not be disregarded.

4

## V.   THE FIFTH CIRCUIT HAS HELD IT IS REVERSIBLE ERROR TO USURP FACTUAL ISSUES FROM THE JURY WHEN DETERMINING BORROWED SERVANT STATUS

In *Brown v. Union Oil Co.*, the Fifth Circuit reversed and remanded for a new trial after the trial court granted a directed verdict on borrowed servant status.  984 F.2d 674, 676 (5th Cir. 1993).[4]  The Fifth Circuit held, "Finding that factual issues exist, we reverse and remand for another trial."  *Id.*  The Firth Circuit acknowledged that borrowed servant status is a matter of law, but that "some cases involve factual disputes on the issue of borrowed servant status and require findings by a fact-finder."  *Id.* at 677; *accord Castille v. Apache Deep Water LLC et al.*, 2017 WL 2814068, *3 (W.D. La. 2017) (holding, in similar case involving the predecessor owner of the platform at issue here, that "factual disputes must be resolved before the district court can make the necessary determination" on borrowed servant). The Fifth Circuit further held that a dispute as to control should have been decided by the jury.  Indeed, the Fifth Circuit explained:

> Brown presented evidence that he was not working under Union's supervision or its cleaning instructions.[5]  This first factor, which does not overwhelmingly support Brown's borrowed servant status, involves disputed factual issues.  ***It should not have been taken from the jury***."

*Brown*, 984 F.2d at 677 (emphasis added).

The Fifth Circuit held it was reversible error not to let the jury decide the borrowed servant issues, including control, even when there was evidence that the borrowing company (a) provided transportation, food, lodging and tools, (b) verified the employees'

---

[4] *Brown* was decided in 1993 after *Melancon v. Amoco Prod. Co.*, the case on which Defendants principally rely.  834 F.2d 1238 (1988).
[5] Plaintiff likewise presented significantly more evidence of lack of control.  *See* discussion below.

time tickets, (c) provided instructions at times, and (d) had the right to remove the plaintiff from the platform—which is essentially the same evidence Defendants urge here.  *See generally id.*  This was largely because there was a contract in place that seemingly denied borrowed servant status—which, again, is the case here.  *Id.* at 678 ("Here, we are also concerned with conflicting evidence and a contract provision that purports to prohibit borrowed employee status.").

## VI.   THE JURY'S FACTUAL FINDINGS ON BORROWED SERVANT GUIDE THE ANALYSIS

The Fifth Circuit further held in *Brown* that it is for the jury—and not the judge— to decide the factors regarding borrowed servant.  *Brown v. Union Oil Co.*, 984 F.2d 674, 679 (5th Cir. 1993).  After determining that the disputed *Ruiz* factors "should not have been taken from the jury," the court held that borrowed servant can be determined by the judge "[o]nce these important factual issues have been resolved[.]"  *Brown v. Union Oil Co.*, 984 F.2d 674, 677, 679 (5th Cir. 1993).

## VII.   IT WAS DEFENDANTS' BURDEN TO PROVE BORROWED SERVANT TO THE JURY, WHICH THEY FAILED TO DO

"Borrowed servant" status is an affirmative defense.  *See Green v. Milbar Hydro-test, Inc.*, 210 F.3d 369, *1 (5th Cir. 2000).  As an affirmative defense, the Defendants bore the burden of proving it by a preponderance of the evidence.  *U.S. v. Molina-Iguado*, 894 F.2d 1452, 1453-1454 (5th Cir. 1990).

Plaintiff walked the jury through each of the borrowed servant elements in closing

argument, and discussed the evidence in support.  By contrast, the Defendants did not.[6]

Much of their borrowed servant evidence had been glazed over and given short-shrift

during trial, and had been developed with leading questions through interested witnesses.

In the 40-minute closing, Defendants chose to argue that Plaintiff's story was fantasy, and

did not address borrowed servant issues—perhaps on purpose.[7]  Juries answer questions

based on the case presented.  Failing to address or minimizing an issue has consequences.[8]

*See MacArthur v. University of Texas Health Center at Tyler*, 45 F.3d 890, 895 (5th Cir.

1995) (holding that claimant that focused in closing argument on other claims as opposed

to Title VII claim—which had been pled—could not complain on appeal about lack of jury

finding on that claim, in addition to fact that she failed to have an instruction or have it

submitted) ("In her closing argument…she did not refer to retaliation based on Title VII at

any point during this argument") ("MacArthur failed to argue this claim").

The Defendants also attempt to inject new evidence into this case that they never

asked the jury to consider.  For example, Defendants now cite to a federal regulation that

purportedly requires platforms to designate a so-called "person in charge" and the

development of "Safety and Environmental Management Systems (SEMS)."  Brief pg. 25.

Defendants also cite to their Trial Exhibit 134.6 (attached as Exhibit JJ), an exhibit that

---

[6] Although not currently available, the closing argument transcript will reflect this.

[7] Defendants' failure to stress borrowed servant issues to the jury may have been strategic.
Defendants sought to convince the jury—first and foremost—that Plaintiff was a liar and had only
himself to blame for his "alleged" injuries as he was the mechanic in charge of repairs.  Defendants
may have correctly recognized it is inconsistent and not credible to simultaneously claim (a) that
Plaintiff controlled repairs and their timing, and (b) that Defendants controlled Plaintiff's work to
such a large extent he was their borrowed servant.

[8] Plaintiff does not mean to suggest the failure to mention an issue in closing is necessarily fatal,
only that it of course has consequences, as it should.

was coincidentally never shown to the jury during the case.[9]  Brief pg. 25-26.

Defendants' arguments on this issue fail for several reasons.  First, this statute was never introduced as evidence.  Second, Defendants fail to mention the law relates to catastrophic emergencies, such as the Deepwater Horizon incident.  *See* Exhibit P to Brief at 30 CFR 250.1931(c); *see also* Brief pg. 25 (mentioning Deep Water Horizon).  Third and perhaps most importantly, as is reflected by the numerous offshore platform cases rejecting borrowed servant in the "post-Macondo" world, the fact that there must be a designated offshore facility person to interface with the Government, and take charge during catastrophes, has nothing to do with whether the oil company exercises such great day-to-day control over contractors and their work that the contractors become borrowed servants.

Designating someone with a semantic title required by a federal regulation does not equate with actual control.  Indeed, the jury expressly found no control.  If the passage of this law and the semantic title of "PIC" was enough to create actual control, there would be no more borrowed servant analysis.  This law is not mentioned—to Plaintiff's knowledge—in a single borrowed servant case cited by the parties.  Further, if one looks at Fieldwood's SEMS policy (that was never shown to the jury) as to what the "Ultimate Work Authority" responsibilities of the "Person In Charge" are, there is no mention of control of the work or the details of the work.  *See* Brief Exhibit Q at pg. 306 (discussing how to coordinate "simultaneous" operations and informing of special problems and

---

[9]The document is in evidence, but having never been shown to the jury or discussed, the Defendants cannot complain as to the weight it may have been given by the jury.

honoring stop work authority).  In fact, this document shows the person in charge does not control the details of the contractors' work on a day to day basis, but instead has high-level coordination responsibilities largely correlated to catastrophic incident response. Coordination does not equate with control.  *Picquet v. M.I. Drilling Fluids LLC*, 1998 WL 398046, *2 (E.D. La. 1998) ("In evaluating the factor of control, it is essential to distinguish between 'coordination' and 'control.'); *Ruiz v. Shell Oil Co.*, 413 F.2d 310, 313 (5th Cir. 1969) ("a careful distinction must be made between authoritative direction and control, and mere suggestion as to details or the necessary co-operation, where the work furnished is part of a larger undertaking").  But regardless of what Fieldwood put down on paper, the trial proved time and time again (as will be discussed below) that Fieldwood's records cannot be trusted, and that what really happened at the platform bore no relation to what Fieldwood said happened.

## VIII.   THE JURY WAS ENTITLED TO DISREGARD DEFENDANTS' WITNESSES AND BORROWED SERVANT STORY ENTIRELY

The Court will recall that Defendants did not timely plead borrowed servant, presumably because the documents do not support the doctrine's application here.  Indeed, Defendants did not develop significant borrowed servant documentary evidence at trial, because none exists.  The vast majority of the documentary evidence introduced at trial— including operative contracts—weighs against borrowed servant status.

Because the documents are largely of no help to them, Defendants rely almost exclusively on self-serving *post litem motam* testimony from interested witnesses.  *See, e.g.* Brief at pg. 21, 23, 26, 30, 33, 35 (citing testimony of Eric Fontenot, the Island

corporate rep that did not work on the platform and who never spent a day working on the platform with Plaintiff); Brief at pg. 18, 19, 20, 22, 26, 27, 32 (citing testimony of Fieldwood's James Hadley, the man who denies seeing or ever talking about Plaintiff falling); Brief at pg. 19, 20, 22, 26, 28, 29, 30, 33, 34, 35 (citing testimony of corporate rep Sean Bernard, who did not work on the platform and who had never seen the contract); Brief at pg. 35 (citing testimony of Vanna Raymond of Waukesha Pearce, a Fieldwood contractor who cooperated with counsel for Island to create demonstratives for trial).[10] For the reasons stated below and others, the jury was entitled to disregard and severely discount such interested oral testimony.

This Court's instructions to the jury correctly stated, ***"You alone are to determine the questions of credibility or truthfulness of the witnesses.  In weighing the testimony of the witnesses, you may consider the witness's manner and demeanor on the witness stand, any feelings or interest in the case, or any prejudice or bias about the case…The testimony of a single witness is sufficient to prove any fact, even if a greater number of witnesses testified to the contrary, if after considering all the other evidence, you believe that witness.***" Dkt. 223 (Jury Charge pg. 4, 5) (emphasis added).

This was a heavily-disputed and hard-fought case.  Respectfully but candidly, the Defendants' witnesses were repeatedly shown to be untruthful.  The Defendants coached and heavily developed their witnesses with leading questions throughout the trial, and their

---

[10] *See* Raymond Test. pg. 97

demeanor, tone, and manner were presented for the jury to evaluate.[11]   The Seventh Amendment dictates that the jury's findings on these critical credibility issues cannot be second-guessed.   The jury should be entitled to determine which version of the parties' borrowed servant factors is truthful, which is heavily disputed as discussed below.

Similarly, the arguments advanced by the Defendants and their witnesses—both at trial and leading up to it in discovery—were repeatedly shown to be untrustworthy and contradictory, and the jury is entitled to weigh that when determining whether and to what extent Fieldwood truly controlled Plaintiff (despite an agreement stating they did not).  *See* Exhibit A, PX160 at pg. 3-4 (contract).

In its opening statement, Fieldwood stated that Plaintiff did not tell anyone about falling until 10 months after the incident or until when he got fired (which was a year after the incident), and promised to show at least four different versions to Plaintiff's story. Opening Transcript at 29.

To corroborate this theory, James Hadley of Fieldwood testified he never saw Plaintiff fall and that he was 100% certain he had never spoken with anyone about Plaintiff falling.  *See* Exhibit D, Hadley Test. at 11-12.  But another witness (Charles Anderson) then revealed a one-on-one discussion with James Hadley about Plaintiff falling in oil at the MP153, a discussion that occurred perhaps as early as two days after the incident.  *See*

---

[11] Many of the leading questions by defense counsel were objected to.  Some were not.  In either instance, the jury was entitled to perceive, consider, and weigh why counsel were attempting to suggest answers, and weigh how much weight to give such testimony.  *See, e.g.*, Exhibit B, Fontenot Test. at 16 (counsel leading his own client and Court instructing counsel for Island Operating to stop leading witnesses); Exhibit C, Bernard Test. at 5, 30 (counsel leading Fieldwood corporate representative); Exhibit D, Hadley Test. at pg. 44-46 (being led by Defense counsel).

Exhibit E, Anderson Test. at 39-40, 59-60.  This was significant, because if Plaintiff had invented the story 10 months later, and if Hadley had never spoken to anyone about it, how could Hadley and Anderson be discussing it at all?  The answer is simple: the Defense witnesses were not being truthful.  *See also* Exhibit F, PX29 (blank daily activity report for day of incident, December 1, 2014, where details of what happed that day were deleted or coincidentally never recorded).

Credibility became an even greater problem for the Defendants when Vanna Raymond took the stand and admitted as a corporate representative that Plaintiff had personally told her about the incident 3-4 months after (not a year later), and that Waukesha-Pearce had in turn reported it to Fieldwood in March 2015.  *See* Exhibit G, Raymond Test. at 127-128.  Defense counsel tried to impeach Ms. Raymond—who had coincidentally just spent most of her testimony criticizing Plaintiff—but the jury saw what was really happening:  a story was unfolding and unravelling.

The credibility issues did not stop there.  Defendants repeatedly argued and insinuated the platform was well-maintained and that there were no significant leak issues, but then Fieldwood's James Hadley took the stand and admitted under cross-examination the roof allowed water to leak through, was in "really bad shape," had "extensive corrosion," was in "desperate" need of repair, admitted leaks through the roof would cause a "slipping hazard," and admitted the roof had been reported as needing repair before Plaintiff fell.[12]  *See* Exhibit D, Hadley Test. pg. 71-73.

---

[12] Coincidentally, the records that allowed the truth to come out regarding the condition of the roof were not produced until shortly before trial.

The Defendants claimed records showed the compressor had not shut down and that Plaintiff's "story was not adding up," only to have additional records subpoenaed from third-parties prove the platform records were false.[13]  *See* Exhibit B, Fontenot Test at 9-11; *compare also* Exhibit H, PX28 pg. 11 (platform record stating no shutdowns) *with* Exhibit I, PX36 pg. 3 (invoice for same date reflecting shutdown).  The Defendants relied on self-serving platform records to "prove" no leaks, when in fact other records (and the photos which do not lie) proved that leaks were rampant.  *See* Exhibit B, Fontenot Test. at 12-16; *see also* Exhibit J, DX3002.11-086, DX3002.12-025, DX3002.12-095, DX3002.14-021 (photos of leaks); *compare also, e.g.*, Exhibit K, PX27 (Fieldwood platform report saying no leak) *with* Exhibit L, PX8 (activity report reflecting leak on same day).  Faced with these contradictions about leaks in the records, the Defendants continued to joust and split-hairs about the extent of leaks, and whether two-years' time since the lawsuit was filed was enough for them to review the records to learn if there had been leaks.  Exhibit B, Fontenot Test. at 15-16.

The Defendants additionally relied, for the first time at trial and without any prior disclosure, upon purported diagnostic records from Mechanical and Performance Analysis Corp. ("MPAC")[14] in an effort to claim there was no pressure packing problem as claimed

---

13 The Court will recall that Plaintiff contends he fell responding to an alarm on December 1, 2014, and that the compressor shut down due to the alarm.  Records showing no shut down—if accurate—would undermine Plaintiff's story.

14 This entity was never disclosed in discovery, and the first time Plaintiff's counsel heard the words "MPAC" were in trial.  Although perhaps this company exists, Plaintiff has been unable to find any company named MPAC or Mechanical and Performance Analysis Corp registered to do business in either Texas or Louisiana.  Had they been disclosed, records could have been subpoenaed from them.

by Plaintiff, only to have it revealed on cross-examination that someone had cut and pasted the data from a different report to apparently create the illusion the data had remained consistent over time. *Compare* Exhibit M, DX140 pg. 9 *et seq.* with DX137 pg. 9 *et seq.* (reports boldly titled with different dates, but with identical data, and with the same micro time-stamp in the top right corner that someone forgot to alter). Initially, Defendants' expert Steve Taylor (who had billed perhaps $200,000 for his work)[15] denied that the data in the later report had been cut and pasted from a prior report, then claimed he could not read them well (even though they had been part of his presentation), then took a 15-minute break, and finally conceded the reports were identical but for changed dates (at least the parts he had examined). *See* Exhibit O, Taylor Test. at 16-22, 23-24.

Also critical to credibility is that the defense witnesses displayed remarkable acuity when answering questions they had been prepared to answer a certain way, and displayed head-scratching ignorance when counsel for Plaintiff sought to confirm basic borrowed servant evidence unfavorable to their position. This disparity is something to be weighed by the jury when determining the truth. Perhaps a good example of this is Fieldwood's corporate representative Sean Bernard, and the issue of what the parties understood regarding control and agreed to regarding control, which are express elements in borrowed servant analysis. *See Brown v. Union Oil Co.*, 984 F.2d 674, 677, 676 (5th Cir. 1993)(outlining elements). Bernard sat through the entire trial, and was the only person Fieldwood brought to speak for the company regarding what was agreed. In fact,

---

[15] *See* Exhibit O, Taylor Test. pg. 5.

Fieldwood objected to anyone else, including its "Person In Charge," answering questions about the contract.  *See* Exhibit D, Hadley Tr. Test. at 47, 48, 50.

Then, when Fieldwood's corporate representative Sean Bernard was called to the stand, he stated he had never even seen the contract and that Fieldwood was not going to even talk about it.  *See* Exhibit C, Bernard Rough Tr. Test. at 20.  The jury is of course allowed to draw inferences from a company's deliberate choice to not address the express promises and understandings reached with Plaintiff's company Waukesha Pearce, namely, that no employee of Waukesha Pearce (including Plaintiff) was to be "deemed to be subject to the control or direction of Company [Fieldwood] as to details of the Work."  *See* Exhibit A, PX160 at pg.3-4.

Not bringing anyone to trial who could speak to promises made by Fieldwood and whether they still stood by them or why they no longer stood by them was a deliberate choice made by Fieldwood—one the jury is entitled to weigh and consider when Fieldwood conveniently presses an alternative borrowed servant narrative.  The jury is entitled to ponder whether to believe (or to discredit) contradictory, naked, oral, conclusory, leading, and unsubstantiated statements of purported control by the defense witnesses (*see, e.g.* Bernard Rough Trial Trans. at 18 being led to say "control" existed), when the company did not even deign to bring someone who could speak intelligently about what it has promised about that issue in writing to the contrary.  *See also* counter-evidence of control discussed below.

The jury is entitled to ponder whether to believe (or discredit) such naked, leading, conclusory, and unsubstantiated statements of control where—at other times—the

Defendants' witnesses insisted there was no control and that Plaintiff had the authority to take action on his own.  *See, e.g.*, Exhibit B, Fontenot Test. at 15 (stating mechanics are responsible for the compressor); *See* Exhibit B, Fontenot Test. at 11 (stating Plaintiff had a perfect opportunity to fix the alleged leaks); *See* Exhibit B, Fontenot Test. at 31 (stating it was part of Plaintiff's routine to keep the compressor room clean).  One of the hallmarks of Defendants' inconsistent positions throughout trial is that Plaintiff was the mechanic, had countless opportunities to fix the compressor, and had unfettered rights to do so at a time and place of his choosing—meaning that they were not controlling him and are not to blame.

The purpose of this rehashing is not to criticize the defense witnesses gratuitously. But it is necessary to understand why the jury's determinations must stand.  It is the testimony of these same witnesses as to what happened at the platform—not their own contracts and documents—upon which Defendants hang their borrowed servant hats. Because this evidence is oral, the jury is entitled—and must—be allowed to consider the credibility of these witness and of the Defendants generally when weighing whether to believe what the Defendants said regarding how they controlled Plaintiff, oversight over plaintiff, opinions as to rights to discharge, and the like.  This is particularly necessary when the Plaintiff and the documents tell a very different story, as discussed below.

## IX.    SAYING THINGS ARE SO DOES NOT MAKE THEM SO

In addition to relying almost exclusively on non-credible testimony from interested witnesses that is contradicted by other evidence, the Defendants' Brief is rife with unsupported and unsubstantiated statements.  *See, e.g.*, Brief pg. 25 ("Plaintiff and his

nominal employer clearly understood…)(no citation).  The jury decided the critical factual

issues in this case based on the ***credible*** evidence, not such table-banging.

### X.   *RUIZ* FACTOR 1:   CONTROL – ANSWERED IN PLAINTIFF'S FAVOR (CURRENT TALLY: 1-0)

The jury answered 7 of the 9 *Ruiz* factors in Plaintiff's favor and against a finding

of borrowed servant.  The most important factor, control, was decided in Plaintiff's favor

as follows:

> Question 1:  Do you find that Fieldwood had control over Milorad Raicevic and
> the work he was performing, beyond mere suggestion of details or cooperation?[16]
>
>    ANSWER:  NO[17]

The Fifth Circuit "has considered the first factor—control—to be the central

factor[,]" and it is the most important factor  *Brown v. Union Oil Co.*, 984 F.2d 674, 676

(5th Cir. 1993); *see also Capps v. N.L. Baroid-NL Industries Inc.*, 784 F.2d 615, 617 (5th

Cir. 1986)("The first, and most important, factor is: Who has control over the employee

and the work he is performing, beyond mere suggestion of details or cooperation?").

Indeed, even when the Defendants discuss the other factors, they repeatedly turn back to

control.  *See* Brief pg. 23 (arguing Factor 2 met because Island testified it took instruction

from Fieldwood); Brief pg. 26 (arguing Factor 3 met because Fieldwood allegedly

controlled Plaintiff); Brief pg. 29 (arguing Factor 5 met because Fieldwood allegedly

controlled Plaintiff); Brief pg. 33 (arguing Factor 8 met because Fieldwood could allegedly

---

16 Throughout their Brief, the Defendants attempt to re-word the questions provided to the jury,
which are based directly on the *Ruiz* factors.  *Compare Ruiz v. Shell Oil Co.*, 413 F.2d 310, 312-
313 (5th Cir. 1969) (outlining factors, including necessity to work for a "considerable" length of
time) *with e.g.*, Brief pg. 31 (stating Plaintiff worked for a "sufficient" length of time).
17 *See* Dkt. 223 pg. 23 (Jury Verdict)

control Plaintiff's presence on platform).  Plaintiff is not aware of a single case in which the Court determined someone was a borrowed servant even though there was not the requisite control—particularly when, as here, there is a contract expressly stating Waukesha Pearce's employees were independent contractors (not borrowed servants), and that they were not subject to the control or direction of Fieldwood (*see* discussion of Factor 3, below).

In determining control, a "a careful distinction must be made between authoritative direction and control, and mere suggestion as to details or the necessary co-operation, where the work furnished is part of a larger undertaking." *Ruiz v. Shell Oil Co.*, 413 F.2d 310, 313 (5th Cir. 1969).

Below is just some of the evidence supporting lack of control[18] upon which the jury was entitled to base its decision, and which precludes Rule 50 judgment for Defendants as a matter of law:[19]

- *See* Exhibit A, PX160 at pg. 3-4:  Master Service Agreement between Fieldwood and Waukesha-Pearce expressly stating no control.
- *See* Exhibit P, Raicevic Testimony pg. 14: Plaintiff testifying he made decisions as to actual repairs and the details of repairs.
- Repeated argument and testimony of defense witnesses that there was no Fieldwood-imposed "3-minute rule" to respond to actual alarms to try and avoid shutdowns (as Plaintiff argued), as compared to a monthly 2 minute 45 second ESD drill (emergency shutdown drill) whereby Fieldwood intentionally tests to make sure its equipment shuts down in that amount of time.  *See* Exhibit D, Hadley Test. at pg. 44-46 (being led by Defense counsel).  In other words, Defendants argued that they did not control how

---

[18] The following evidence in certain ways directly supports a finding of no control, and in other ways indirectly does so, in part by highlighting the inconsistencies in the Defendants' positions, which in and of itself calls into question the borrowed servant story advanced by the Defendants.
[19] This is just from the evidence currently available.  As trial just ended, additional transcripts are not available.

Plaintiff responded to alarms, and that Plaintiff self-imposed a 3-minute rule to respond to actual alarms.

- Defendants repeatedly arguing that—at the time of the incident—Plaintiff responded on his own to the alarm in the middle of the night, decided on his own what needed attention, took a route he chose, took a path into the bowels of the compressor machinery that he chose, and took a path of the compressor that he chose. *See, e.g.*, Exhibit KK, Opening pg. 29 (claiming they would prove the route Plaintiff took near the vent pipe was silly).

- *See* Exhibit Q, DX540 at WPI148: "Waukesha Pearce Industries Inc. Service Report" filled out by Plaintiff detailing the work he was doing on the shift he was injured.  All work done by Plaintiff was detailed on Waukesha Pearce service reports.

- *See* Exhibit G, Vanna Raymond Testimony pg. 116-117 (Waukesha Pearce corporate rep):  Stating Waukesha Pearce supervisor Ken Knowles supervised Plaintiff in the field, the work he was doing, what he was doing, and where he was.

- Incident report from December 1, 2014 listing "Ken Knowles" of Waukesha Pearce as Plaintiff's supervisor, not someone at Fieldwood.

- *See* Exhibit R, PX151 – Waukesha-Pearce job description outlining Plaintiff's "scope of work" and "primary job responsibilities" indicating that Plaintiff was told what to do and received instructions as to the scope and details of his work by Waukesha Pearce.  There is no documentary evidence of Fieldwood providing any work instructions.

- *See* Exhibit P, Raicevic Testimony pg. 13: Stating Waukesha Pearce told him to go to Fieldwood platforms and had the right to tell him to go elsewhere.

- *See* Exhibit S, PX30 – Joint Safety Analysis form outlining a task and signed only by Mickey Raicevic as "Immediate Supervisor," proving Plaintiff was unsupervised by Fieldwood when working.

- Repeated arguments and testimony by defense witnesses and counsel that Plaintiff was responsible for the compressor and controlled what repairs needed to be done, when to do them, and that it was part of Plaintiff's routine to clean the compressor building.  *See, e.g.*, Exhibit B, Fontenot Test. at 15 (stating mechanics are responsible for the compressor); Exhibit B, Fontenot Test. at 11 (stating Plaintiff had a perfect opportunity to fix the alleged leaks); Exhibit B, Fontenot Test. at 31 (stating it was part of Plaintiff's routine to keep the compressor room clean).

- *See* Exhibit P, Raicevic Testimony pg. 13:  Stating Waukesha-Pearce made decisions regarding rate of pay. The jury is entitled to infer that controlling the purse strings is commensurate with controlling an employee, and that logically the person who controlled a person would also make decisions regarding pay.

19

- *See* Exhibit T, PX152 – Waukesha Pearce training summary sheet for Plaintiff, showing they controlled his development and how he did things. There is no documentary evidence of Fieldwood providing any control or training in this regard.
- *See* Exhibit U, PX101 – Waukesha Pearce Payroll Change Notice demonstrating Waukesha Pearce controlled his pay, promotions, and job titles.  The form expressly references his supervisor on a Waukesha Pearce form.  There is no similar evidence of Fieldwood control in this regard.
- *See* Exhibit V, PX102 – Waukesha Pearce Performance Evaluation.  There is no evidence of Fieldwood evaluating his performance.  This is evidence of control, and the jury is entitled to infer that the party who controls what a person does would naturally be the party that evaluates and seeks to reward or adjust what the person does.
- *See* Exhibit W, DX145 – Log book entitled "WPI Mechanic's Log" indicating Waukesha Pearce (a.k.a. WPI) controlled and oversaw the details of the mechanic work.
- *See* Exhibit X, PX44 – Person on Board form where Plaintiff required to state he is with Waukesha Pearce at all times while on Fieldwood's platform.  This is consistent with a multitude of other platform documents where Plaintiff is repeatedly required to document and represent that he is working as an employee of Waukesha Pearce, which the jury is entitled to infer as Waukesha-Pearce was overseeing and controlling him.
- *See* Exhibit Y PX71 – Job Safety Analysis form whereby Plaintiff was required to identify he was with the Company "WPI" or Waukesha Pearce Industries when doing specific tasks.
- Testimony that at all times and even while at Fieldwood platforms, contractors were required to adorn their own company's uniforms and insignia.  *See, e.g.*, Exhibit P (Raicevic Test. pg. 15); *See* Exhibit J, DX3002.12-065 and DX3002.16-068 (photos showing Island operating employee bearing Island Operating insignia on hardhat and uniform).  The jury was entitled to infer that this was because the persons remained under the supervision and control of their own company, and was sending that message to anyone who observed them.  The jury was also allowed to infer that the "borrowed servant" argument advanced by the Defendants was a legal fiction created for purposes of avoiding liability, when in reality in the field, the companies go to great pains to separate themselves and avoid any impression that they control each other.

The Plaintiff here presented more compelling evidence than the plaintiff in *Castille*, 2017 WL 2814068.  There, the oil company argued the requisite control existed over a third party technician because (1) the oil company provided explicit task lists of work for the

plaintiff to perform; (2) the plaintiff slept on oil company platforms; (3) the plaintiff was required to attend oil company safety meetings; (4) the oil company could order the plaintiff to leave the platform and do work on other platforms; and (5) the oil company could probably get the technician fired.   *Castille*, 2017 WL 2814068 at *4.  The plaintiff countered that the oil company did not specifically instruct him *how* to perform the specified work tasks, which the district court found was "consistent with the terms of the MSA," and its independent contractor provision.  *Id*.  Holding the jury should decide, the district court's conclusion, into which the parties in this case could easily be inserted, was that:

> Ultimately, the record indicates that [Raicevic] was [Waukesha's] technician sent to work on [the oil company's] platforms. The examples cited by [Fieldwood] as "control" factors are merely examples related to [Fieldwood] being the owner of the platforms and the direction required to control the work on the platforms. Accordingly, the factual determination of who controlled [Raicevic's] work should be decided by the fact-finder unless the other factors overwhelmingly support [Raicevic's] borrowed employee status

*Id*. at *5.

The jury's control finding in this case was also supported by stronger evidence than in *Brown*, in which the Fifth Circuit held the jury was entitled to decide the control factor because, even though he had been controlled by the oil company in the past, and although he had previously been provided explicit instructions from the oil company regarding the work task he was injured performing, there was evidence the plaintiff was working alone the and possibly unsupervised at the time of the injury.  *Brown*, 984 F.2d at 677 ("[t]his first factor, which does not overwhelmingly support Brown's borrowed employee status,

involves disputed fact issues.  It should not have been taken from the jury.").  Here, by contrast, one of the key *defense* arguments was that Plaintiff was doing something of his own volition in the middle of the night at the time of the Incident, and that nobody from the oil company (or any company) instructed Plaintiff to do what he did or provided any supervision.[20]

The simple fact is Fieldwood did not establish, and certainly not as a matter of law, that it controlled Plaintiff anywhere close to the degree necessary to be deemed his quasi-employer.  Defendants did not rebut credible evidence regarding the lack of Fieldwood's control, the degree and nature of Waukesha Pearce's continued supervision and control, or Plaintiff's performance of work unsupervised.  At best, Fieldwood raised a fact issue on its affirmative defense that the jury was entitled to decide in favor of Plaintiff.  *See Robinson v. Apache Corp.*, 2006 WL 622917, *3 (E.D. La. 2006) (holding there was a material issue of fact where record was unclear as to "exactly how much authority was asserted over plaintiff by each of his supervisors").

Based on the foregoing, this Court cannot grant Defendants' Rule 50 Motion, and certainly not if it draws all reasonable inferences in favor of Plaintiff, does not make

---

[20] This of course, does not alleviate Fieldwood of its negligence in the consequences of its actions, decisions made regarding platform shutdowns, refusing to properly address the persistent oil leaks, or to correct defective conditions. *See, e.g., Cormier v. Gulf Oil Corp.*, 665 F. Supp. 1226, 1234 (E.D. La. 1987) (affirming finding of no borrowed servant, despite the fact that contractor occasionally took orders from oil company and that oil company provided tools, and that oil company could have him removed, and that he worked for oil company continuously over a 5 year period; and that despite not being borrowing employer and not having control, oil company could be held liable).

credibility determinations or weigh the evidence on its own, and disregards all evidence favorable to Defendants that the jury is not required to believe. *See Reeves v. Sanderson Plumbing Products Inc.*, 530 U.S. 133, 150 (2000). The Court should find that Plaintiff was not Fieldwood's borrowed servant.

## XI. *RUIZ* FACTOR 2: ANSWERED IN DEFENDANTS' FAVOR (CURRENT TALLY: 1-1)

Question 2: Was Milorad Raicevic performing Fieldwood's work?

ANSWER: YES[21]

There was ample evidence that Plaintiff was performing Waukesha Pearce's work, and not Fieldwood's work. Indeed, the following alone would have been ample evidence for the jury to decide this in Plaintiff's favor:

- *See* Exhibit Z, PX13 – Waukesha Pearce Service Report on Waukesha Pearce form showing that Plaintiff was doing Waukesha-Pearce's work.
- *See* Exhibit G, Raymond Rough Tr. Testimony at 102:

*See, e.g., Castille,* 2017 WL 2814068 at *5 ("Total Safety supplied workers to do Apache's work on its platforms, and Castille was allegedly injured while working on Apache's platforms. He was doing the work that his employer, Total Safety, hired him to perform as a fire, gas and navigational aid technician, and he was also helping to accomplish Apache's work on the fixed platforms; therefore, a factual dispute exists concerning the second factor").

Despite evidence to the contrary, the jury has spoken and decided this factor against the Plaintiff. Incidentally, the Defendants had no issue relying on the jury's finding on this

---

[21] *See* Dkt. 223 pg. 23 (Jury Verdict).

factor because it benefited them.  *See* Brief pg. 22 ("the jury concluded Plaintiff was performing Fieldwood's work").

## XII. *RUIZ* FACTOR 3:  ANSWERED IN PLAINTIFF'S FAVOR (CURRENT TALLY: 2-1)

Question 3:  Was there an agreement, understanding, or meeting of the minds between Waukesha-Pearce Industries and Fieldwood?

ANSWER:  YES[22]

This factor was decided in Plaintiff's favor, and weighs against borrowed servant status.  The existence of a valid written agreement was never disputed by the Defendants, and was acknowledged at the charge conference as being undisputed.  In their Brief, the Defendants agree the language in the contract is not ambiguous.  Brief pg. 26 (last para.)

The contract unambiguously states that Waukesha Pearce employees are independent contractors not subject to the control of Fieldwood, as reflected below:



*See* Exhibit A, PX160 at pg. 3-4.

The case law states that a contract that precludes borrowed servant status and control does not "***automatically***" preclude a borrowed servant finding, and that the parties "***can***

---

[22] *See* Dkt. 223 pg. 23.

24

impliedly" modify the contract as to control. *Brown v. Union Oil Co.*, 984 F.2d 674, 677-678 (5th Cir. 1993) (emphasis added). Although not necessarily dispositive, this case law demonstrates that a contract precluding borrowed servant status and lack of control should be given very strong weight. Stated otherwise, sophisticated businesses should be kept to the promises they have made.

Moreover, even though contacts ***can*** be theoretically modified, the contract here states it can only be modified in writing:

> 23. **Modification of Contract.** No change, modification, extension, renewal, ratification, waiver or rescission of this Contract or of any of the provisions hereof shall be binding unless it is in writing and signed by both Parties. Further, no waiver or forbearance by either Party with respect to any right granted to such Party hereunder shall operate or be construed to be a waiver or forbearance of such Party's right to exercise such right in the future.

*See* Exhibit A, PX160 at FWE15.

There is no evidence the contract language was ever modified or waived in writing as is required. This writing requirement is fatal to a modification or waiver argument. Defendants ignore this issue, and then simply re-hash their arguments as to control—ignoring all the evidence to the contrary—and contend that the "reality" of how things happened weighs in favor of borrowed servant status. Brief pg. 26-27. In support, the Defendants cite to the testimony of Sean Bernard, James Hadley, and Eric Fontenot—their own witnesses whose credibility the jury was right to question. Moreover, the Defendants conveniently ignore any of the documents demonstrating no control.

The problem with the Defendants' argument—in addition to ignoring the contract language that modifications or waivers must be in writing—is that the jury expressly found that Fieldwood did ***not*** control Plaintiff. *See* discussion, above regarding Question 1.

25

Thus, not only does the contract preclude control and non-written modifications, but the reality at the worksite is that there was no control to effectuate a modification. Thus, even if the contract could have been modified by conduct and not in writing, it was not.

### XIII.  *RUIZ* FACTOR 4:   ANSWERED IN PLAINTIFF'S FAVOR (CURRENT TALLY:  3-1)

Question 4:  Did Milorad Raicevic acquiesce in the new work situation?

ANSWER:  YES[23]

By the time the jury answered this question, they had already determined that Plaintiff was not under Fieldwood's control, and confirmed (which was undisputed) that there was an agreement between Fieldwood and Waukesha Pearce (which indisputably negates control).  Plaintiff did acquiesce to being an independent contractor still employed by Waukesha Pearce, supervised by Waukeha Pearce, and ultimately subject to Waukesha Pearce's control.  Plaintiff did agree he was not subject to Fieldwood's control, as the jury found.  Plaintiff did acquiesce to go work on Fieldwood platforms.  This answer is entirely consistent with the jury's findings of no control and Plaintiff's contention of no control, and weighs against borrowed servant status.

### XIV.  *RUIZ* FACTOR 5:   ANSWERED IN PLAINTIFF'S FAVOR (CURRENT TALLY:  4-1)

Question 5:  Did Waukesha-Pearce terminate its relationship with Milorad Raicevic?

ANSWER:  NO[24]

This factor was clearly answered in Plaintiff's favor, and weighs against borrowed

---

[23] *See* Dkt. 223 pg. 23.

[24] *See* Dkt. 223 pg. 24 (Jury Verdict).

servant status.  It was undisputed at trial that Plaintiff was required to always adorn his Waukesha Pearce uniform, was always paid by Waukesha Pearce, and continued to be employed by Waukesha Pearce for a year after the incident.  The evidence, discussed above in the control section, also shows that Plaintiff got his work instructions from Waukesha Pearce, continued to be supervised in the field by Waukesha Pearce, was evaluated by Waukesha Pearce, was told where to go by Waukesha Pearce, and the like.

In their Brief, the Defendants attempt to side-step this factor which the jury clearly decided against them, and instead simply re-argue that they controlled the Plaintiff.  Brief pg. 29 ("The evidence establishes that Waukesha Pearce's control over Plaintiff was minimal…").  They also ignore the testimony, including testimony they elicited, in which Vanna Raymond repeatedly confirmed that Plaintiff was a Waukesha Pearce employee, had a Waukesha Pearce supervisor, and was subject to the control and direction of Waukesha Pearce.  *See, e.g.,* Exhibit G, Vanna Raymond Testimony pg. 116-117.  This factor weighs heavily against borrowed servant.

## XV.   *RUIZ* FACTOR 6:   ANSWERED IN DEFENDANTS' FAVOR (CURRENT TALLY:  4-2)

Question 6:  Did Fieldwood furnish the tools and place for Milorad Raicevic's performance?

ANSWER:  YES[25]

There was ample evidence for the jury to answer this question in Plaintiff's favor. He testified he brought his own tools.  *See* Exhibit P, Raicevic Test. pg. 15.  But it was also undisputed the incident occurred on a Fieldwood platform.  Ultimately, the jury answered

---

[25] *See* Dkt. 223 pg. 24 (Jury Verdict).

this question in Defendants' favor.  Coincidentally, the Defendants were more than willing to embrace this particular jury finding.  *See* Brief pg. 31 ("the jury concluded Fieldwood furnished the tools and place for the performance…").

## XVI.   *FACTOR* 7:  ANSWERED IN PLAINTIFF'S FAVOR (CURRENT TALLY:  5-2)

Question 7:  Did Milorad Raicevic work for Fieldwood for a considerable length of time?

ANSWER:  NO[26]

The jury answered this question in Plaintiff's favor, and it weighs against borrowed servant status.  The Defendants claim it is undisputed that Plaintiff worked at the platform since at least January 2014.  Brief pg. 32.  That is not entirely true.  The evidence showed that Plaintiff worked at other locations, including at Waukesha Pearce offices every month.  *See* Exhibit G, Raymond Tr. Test. at 37.  Moreover, Plaintiff had been out of work for several weeks before the incident—a fact the Defendants made much ado about.  At the time of the incident, Plaintiff had only been on the platform for less than one week.  The platform is over 40 years old.  It has been owned by Fieldwood for many years.  The Defendants were free to advance their argument as to why—given the circumstances—Plaintiff had worked for Fieldwood for a considerable amount of time.  The jury believed that given the totality of the circumstances it was not a considerable length of time.

## XVII.   *RUIZ* FACTOR 8:   ANSWERED IN PLAINTIFF'S FAVOR (CURRENT TALLY:  6-2)

Question 8:  Did Fieldwood have the right to discharge the [sic] Milorad Raicevic?

---

[26] *See* Dkt. 223 pg. 24 (Jury Verdict).

ANSWER:  NO[27]

The jury answered this factor in Plaintiff's favor and against borrowed servant status.  They were correct in doing so, as this factor favors Plaintiff.  He was ultimately terminated by Waukesha Pearce on Waukesha Pearce letterhead.  *See* Exhibit AA, PX6. The termination makes no mention of Fieldwood.  *See* Exhibit AA, PX6.  It makes no mention of the MP153B platform.

As to the unrelated issue of having someone removed from the platform, there was a fact issue as to who made that call.  James Hadley of Fieldwood confirmed that he first must consult with the company supplying the worker, and that he could not just kick someone off the platform.  *See* Exhibit D, Hadley Test. pg. 18.  Plaintiff testified that Fieldwood's Person-In-Charge had tried to have him removed from the platform on multiple occasions, but was unsuccessful.  *See* Exhibit P, Raicevic Tr. Test. at 165-166 (Ex. E to Defendants' Brief).  The contract states access to facilities can be denied, but then suggests that specific personnel can only be removed by Fieldwood for cause, that Waukesha Pearce makes the decision to remove, and that only Waukesha Pearce can make termination decisions.  *See* Exhibit A, PX160 pg. 4.  Plaintiff testified Waukesha Pearce told him where to go.  *See* Exhibit P, Raicevic Tr. Test. pg. 13.

In sum, there is more than ample evidence for the jury to have answered this question in the way it did.

---

[27] *See* Dkt. 223 pg. 24 (Jury Verdict).

### XVIII. *RUIZ* FACTOR 9:  ANSWERED IN PLAINTIFF'S FAVOR (FINAL TALLY:   7-2—AND HEAVILY WEIGHTED IN PLAINTIFF'S FAVOR CONSIDERING THE CONTROL FINDING)

Question 9:  Did Fieldwood have the obligation to pay Milorad Raicevic?

ANSWER:  NO[28]

The jury answered this favor in favor of Plaintiff and against borrowed servant status, as they should have.  Plaintiff testified he is paid by Waukesha Pearce.  *See* Exhibit P, Raicevic Tr. Test. Pg. 12. His paycheck was cut by Waukesha Pearce.  *See* Exhibit P, Raicevic Tr. Test. Pg. 12-13.  There is no evidence of a single penny being paid by Fieldwood to Plaintiff, or an obligation of Fieldwood to pay plaintiff.

The Defendants claim—without credible proof—that they approved Plaintiff's time tickets, and that such approval was required for Plaintiff to be paid.  Some cases give weight to that argument, although the *Ruiz* factor has never been re-worded or amended as stated above.  Nevertheless, it is disputed as to whether or not that really happened here, and in fact the more credible evidence is that Fieldwood did ***not*** play a role in approving Plaintiff's pay.  Indeed, Vanna Raymond testified that Plaintiff is paid by Waukesha Pearce's IT department completely independent of the separate issue of billing Fieldwood or the alleged issue of Fieldwood approving Plaintiff's time.  *See* Exhibit G, Vanna Raymond Rough Tr. Tran. pg. 100-101. Ms. Raymond made it clear that—***although it has now changed***—back then Plaintiff would be paid before Fieldwood was even billed for his services.  *See* Exhibit G, Raymond Rough Trial Tr. at 101.[29]

---

[28] *See* Dkt. 223 pg. 24 (Jury Verdict)

[29] The fact that Vanna Raymond gave this testimony that would tend to support Plaintiff's position on borrowed servant is remarkable.  She spent most of her trial testimony characterizing Plaintiff

Defendants' Brief states the opposite—without citation—that Plaintiff was paid only after his service reports were approved.  Brief pg. 36.  There is a difference between saying things and proving them with credible evidence.  As to the purported testimony that Fieldwood also approved the time tickets at some point, there is doubt as to whether that really happened, and whether it played any role in Plaintiff being paid.  Indeed, there are a multitude of Waukesha Pearce service reports from 2014 involving Plaintiff that are not signed by Fieldwood, ***including the very shift during which he was hurt***:



*See* Exhibit Q, DX540 at pg. 6.

---

as a liar and as someone who was trying to avoid going back to work.  Her company works for Fieldwood, she appeared voluntarily for them, she admitted that she had helped counsel create demonstratives for trial.  *See* Exhibit G (Raymond Test. pg. 97).

Defendants' Brief states that Sean Bernard of Fieldwood (an interested witness the jury was not obliged to believe) testified he "would usually just send an email approving the time sheets[.]" Brief pg. 35. The jury must have been scratching its head and thinking, "Where are the emails?" There is no proof of any such emails, and Defendants wholly failed in their burden of establishing the borrowed servant defense. *See Castille v. Apache Deep Water LLC et al.*, 2017 WL 2814068, *6 (W.D. La. 2017) ("Apache has not established that Plaintiff submitted his time tickets to Apache or that the time tickets were verified by Apache…More significantly, this evidence fails to establish the procedure by which Total Safety billed Apache…")(denying borrowed servant summary judgment).

## XIX.   NONE OF DEFENDANTS' CASES ARE HELPFUL TO THEIR POSITION, WHICH THEY HAD THE BURDEN TO PROVE

The Defendants cite cases in which courts found borrowed servant status existed, ignoring the cases where borrowed servant status was found to be lacking. The Defendants attempt to take language from helpful cases—decided on the unique facts of those cases— to create new rules not encapsulated in the *Ruiz* factors.

For example, Defendants attempt to re-write the *Ruiz* factor regarding the right to discharge, claiming it only pertains to the right to discharge from the platform. Brief pg. 32-33. First, Plaintiff has shown that Fieldwood did not have the right to discharge him from the platform. *See* discussion, above. But even then, the Fifth Circuit does consider the fact that Fieldwood could not terminate Plaintiff's employment from Waukesha Pearce to be significant as well. *See West v. Kerr-McGee Corp*, 765 F.2d 526, 531 (5th Cir. 1985) ("Although Kerr-McGee could dismiss West from the platform, it could not fire him from

his position with Berry Brothers.")(reversing the trial court's borrowed servant summary judgment, and remanding for a trial); *Castille v. Apache Deep Water LLC et al.*, 2017 WL 2814068, \*6 (W.D. La. 2017) (weighing whether borrowing employer could terminate employee from his actual employer, and deeming the opinions offered on the issue speculative)(denying borrowed servant summary judgment motion).

Another example is where Defendants claim they need not "micro-manage" a borrowed employee in every discrete task (Brief pg. 18), but ignore the case law which gives great significance to lack of control as to the work performed. *See Brown v. Union Oil Co.¸*984 F.2d 674, 677 (5th Cir. 1993)("At trial, the parties presented conflicting testimony regarding who instructed Brown on how, where, and when to clean the mud.") (reversing directed verdict on borrowed servant remanding for new trial); *Castille v. Apache Deep Water LLC et al.*, 2017 WL 2814068, \*4 (W.D. La. 2017)("Apache makes no suggestion that it directed Castille specifically as to how or when his job was to be performed.")(denying borrowed servant summary judgment motion).

Another example is where Defendants selectively cite to cases in which borrowed servant status has been found on the first day of the job (because the other factors pointed to borrowed servant)(*see* Brief pg. 31-32), but ignore cases in which the court found a fact issue existed as to whether 2 years, 8 months, or 9 months was a considerable amount of time. *See Castille v. Apache Deep Water LLC et al.*, 2017 WL 2814068, \*6 (W.D. La. 2017)("If the length of time is deemed to be considerable, it would weigh in favor of Castille as Apache's borrowed servant.").

Throughout Defendants brief cases are cited in which a worker "***may*** still be a

borrowed employee" or where contracts "***can***" be modified or where lack of control is not "***necessarily***" determinative.   Brief pg.  16, 24, 14.  While that may be theoretically true, here the jury found Plaintiff did not meet the borrowed servant factors.  Defendants fail to appreciate it is not Plaintiff's burden to disprove the possibility of borrowed servant status, but rather it was Defendants' burden to prove the status was met.

Finally, Defendants' cases finding borrowed servant status involved affirmative findings of control and/or did not find lack of control, did not usurp jury findings of "no control," and ***certainly*** did not usurp jury findings of "no control" that are accompanied by and consistent with contractual provisions stating that no control or right to control exists. *See, e.g.*, *Melancon v. Amoco Production Co.*, 834 F.2d 1238, 1245 (5th Cir. 1988) ("Amoco clearly had control over Melancon and his work…"); *Mosley v. Wood Group PSN Inc.*, 2017 WL 4407923, *5 (E.D. La. 2017) (holding "each factor heavily weights in favor" of borrowed servant status); *Bourgeois v. W & T Offshore Inc.*, 2013 WL 4501326, *3 (E.D. La. 2013) (as to control, holding "The admissible evidence shows that this factor weighs in favor of borrowed employee status").

This is extremely significant.  Defendants are asking the Court to disregard jury factual findings even though they are *consistent* with the contract that they drafted and agreed to.  This has never been done before, is antithetical to the Seventh Amendment, and should not be done here.  U.S. CONST. amend. VII ("no fact tried by a jury, shall be otherwise re-examined in any Court of the United States").

**XX.   DEFENDANTS HAVE NOT EVEN MET THE CONDITIONS PRECEDENT TO A BORROWED SERVANT DEFENSE, NAMELY, THAT PLAINTIFF WAS COVERED AND PAID LHWCA BENEFITS**

Defendants claim, "There is also no legitimate dispute that, after this alleged accident, Plaintiff received LHWCA benefits from his employer." Brief pg. 11. There is no proof in the record LHWCA benefits were paid or that Defendants had an obligation to pay them, and counsel for Plaintiff has repeatedly asked Defendants to prove this element of their defense. Defendants cite to a plea in intervention filed by Waukesha Pearce as proof LHWCA benefits were paid. This complaint, which was voluntarily dismissed, is not proof of benefits being paid, and if anything can be read as an admission against such benefits being paid. *See* Dkt. 77, 94. Defendants then cite to an injury report that is not part of the trial record as proof that LHWCA benefits are at issue. Brief pg. 11. But the form merely reports an injury to the Department of Labor and states that it is being reported under the Longshore and Harbor Workers Compensation Act. *See* Exhibit C to Brief. This report does not prove that LHWCA benefits were paid. Defendants then claim the claim form is consistent with "records procured in discovery" (Brief pg. 11), when in fact the records produced in discovery indicate that Texas Workers Compensation Benefits were paid, not LHWCA. *See, e.g.*, Exhibit II. Defendants have never explained this discrepancy.

As a final Hail Mary, Defendants claim that Plaintiff "*would* have been provided LHWCA coverage and benefits pursuant to Fieldwood's policy of insurance…." Brief pg. 11 (emphasis added). In support, Defendants submit an affidavit from a Mr. Mark Mozell, who was never disclosed as someone having knowledge of relevant facts. *See* Exhibit BB

(Fieldwood's Amended Disclosures).  He purports to give legal conclusions as to coverage in place and benefits that would have been paid.  Given that the trial is over and this witness was never disclosed much less examined, this is not evidence, should be stricken, and Plaintiff moves that it be stricken if such a motion is required.  It should also be stricken due to its conclusory nature, and due to lack of foundation.  Defendants also submit an insurance policy of Fieldwood, which was never produced in discovery and which differs from the policies that were produced.  *See* Exhibit D to Brief; *compare with* Exhibit CC (FWE 9751-9811) and Exhibit DD (FWE 9812-9858).  Again, this is not competent evidence.  Lastly, Plaintiff's reading of the policy does not reveal any coverage applicable to Plaintiff—it seems to pertain solely to Fieldwood employees, and there is no endorsement for Waukesha Pearce employees or even "borrowed servants."[30]  *See generally* Exhibit D to Brief.  Thus—even if this post-trial and non-disclosed "evidence" were to be considered (it should not)—it appears Fieldwood did not maintain workers compensation insurance, and could not have provided workers compensation benefits, which is a precursor to enjoying the workers compensation bar to suit.  *See* 33 U.S.C. 905(a).  Indeed, those who are required to provide workers compensation but do not may be sued, and may not assert contributory negligence as a defense.  Defendants' post-trial attempt to meet the conditions precedent to asserting a borrowed servant defense fails.

---

[30]Counsel for Plaintiff, having just received the document, does not purport to be an expert in Fieldwood's policy.

## XXI. DEFENDANTS' REQUEST FOR A BORROWED-SERVANT FINDING BETWEEN (A) FIELDWOOD AND (B) WOOD GROUP AND ISLAND MUST BE DENIED AS THE JURY DID NOT REACH THE                                                                    ISSUE

The Defendants expressly requested that the jury not answer borrowed servant questions as to them unless there was a finding of liability against them.  *See* Dkt. 223 (Jury Charge and Verdict).  Having not found liability as to Wood Group or Island Operating, there is no need to consider their affirmative defenses.  *See Green v. Milbar Hydro-test, Inc.*, 210 F.3d 369, *1 (5th Cir. 2000) (holding because no liability found by jury, it "obviated the need to consider affirmative defenses" and the "jury never had to reach the borrowed servant issue").[31]

If this response shows anything, it is that the issues of borrowed servant are heavily contested and are rife with fact issues.  There is no authority for this Court to usurp the jury's role, especially when the parties themselves chose not to submit the question to the jury unless liability was found.  *See Brown v. Union Oil Co.*, 984 F.2d 674, 677 (5th Cir. 1993)(holding factual borrowed servant issues must first be decided by the jury).

In fact, the evidence suggests that Fieldwood controlled Wood Group and Island to a lesser extent than Plaintiff.  The contracts between the Defendants likewise disavow "control" and state the employees are "independent contractors."  *See* Exhibit EE, PX48

---

[31]If the Court were to guess as to how the jury may have decided this borrowed servant issue between Fieldwood and its operators, it should rule that Wood Group and Island were not Fieldwood's borrowed servants as a matter of law.  *Gonzalez v. Missouri Pac. R. Co.*, 511 F.2d 629, 633 (5th Cir. 1975) (""The Seventh Amendment mandates this Court to search for a view of the case that makes the jury's answers consistent"); *see also Special Promotions Inc. v. Southwest Photos Ltd.*, 559 F.2d 430, 432 (5th Cir. 1977) (holding a court "is constitutionally required to search for a view of the case that makes the jury's answers consistent").

pg. 5 (Wood Group and Fieldwood), *see also* Exhibit FF PX49 pg. 5 (Island and Fieldwood).  The Wood Group operator job description states they are to operate platforms "without supervision."  *See* Exhibit GG, PX46.  The Island job description likewise states that its operators are to "Work Alone" and "Lead all safety processes."  *See* Exhibit HH, PX122.  Any self-serving and highly-coordinated testimony given by the Defendants as to their joint borrowed servant defense need not be given any weight.  With all due respect, it is clear that the borrowed servant defense was something tailored for trial to avoid liability, and which bore little relation to reality.  Conversely, the considerable evidence developed at trial that operators are supervisors that work alone and who are not subject to Fieldwood's heavy control should be given weight.

### XXII.    CONCLUSION AND PRAYER

This Court should not be the first ever to disregard the jury's Seventh Amendment findings, in the face of a contract with which the findings are consistent, to find for Defendants on a late-pled issue on which they had the burden of proof.  Plaintiff Milorad Raicevic prays that Defendants' Rule 50 motions be denied, and that the Court enter a ruling that Plaintiff was not the borrowed servant of Defendant Fieldwood Energy LLC based on the jury's findings, that the Court decline to enter a judgment as to the borrowed servant status of Wood Group and Island Operating, and for all other relief to which he is entitled.